No. 24-1008

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

HELICOPTER ASSOCIATION INTERNATIONAL, et al.,
*Petitioners*,

v.

FEDERAL AVIATION ADMINISTRATION, et al.,
*Respondents*.

On Petition for Review of an Order of the
Federal Aviation Administration and National Park Service

**FEDERAL RESPONDENTS' ANSWERING BRIEF**

Of Counsel:

PATRICIA DEEM
*Senior Attorney*
Office of the Chief Counsel
Federal Aviation Administration

SARA PORSIA
*Attorney*
Office of the Solicitor
U.S. Department of the Interior

TODD KIM
*Assistant Attorney General*

JUSTIN D. HEMINGER
BENJAMIN W. RICHMOND
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3977
benjamin.richmond@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY.................................................................................. viii

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION........................................................3

STATEMENT OF THE ISSUES............................................................3

PERTINENT STATUTES AND REGULATIONS......................................4

STATEMENT OF THE CASE...............................................................4

    A.    Statutory and regulatory background .....................................4

    B.    Factual background .............................................................8

        1.    Hawaiʻi Volcanoes National Park............................8

        2.    The Agencies' process for developing the ATMP ..................11

        3.    The Agencies' decision adopting the ATMP............................14

SUMMARY OF ARGUMENT ............................................................19

STANDARD OF REVIEW .................................................................22

ARGUMENT .................................................................................23

I.    The Agencies reasonably considered all relevant factors and
responded to significant comments when they adopted the
ATMP. ..................................................................................23

    A.    The Agencies reasonably addressed public comments
about safety, and FAA rationally determined that the
ATMP is safe.........................................................................24

1. The Agencies' analysis of safety and response to public input about safety issues was reasonable...................24

2. Petitioners' remaining safety arguments fail. ...........................30

B. The Agencies reasonably considered concerns about the ATMP's potential impacts to elderly, disabled and mobility-impaired persons...................................................38

1. The Agencies sufficiently considered and responded to public comments about accessibility.................39

2. Petitioners' substantive arguments about accessibility lack support under the Management Act and have otherwise been forfeited. ...................................43

II. The appropriate remedy, if any, is remand without vacatur..........................47

CONCLUSION ...................................................................................50

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Aerial Banners, Inc. v. F.A.A.*,
547 F.3d 1257 (11th Cir. 2008) ....................................................31

*All. for the Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023) ..........................................................22

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993)........................................................48

*Altera Corp. & Subsidiaries v. Commissioner of Internal Revenue*,
926 F.3d 1061 (9th Cir. 2019) ........................................23, 34, 43

*Alvorada Community. Hosp v. Shalala*,
155 F.3d 1115 (9th Cir. 1998) ...............................................35, 43

*Am. Min. Cong. v. U.S. E.P.A.*,
965 F.2d 759 (9th Cir. 1992) ..................................................23, 27

*Ashley Creek Phosphate Co. v. Norton*,
420 F.3d 934 (9th Cir. 2005) ..................................................37, 38

*Becerra v. Gresham*,
142 S. Ct. 1665 (2022)...................................................................29

*Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of,*
*Com.*, 792 F.3d 1027 (9th Cir. 2015) .....................................27, 41

*Cal. Cmties. Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012) ..................................................48, 50

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
513 F. Supp. 3d 154 (D.D.C. 2021)................................................41

*Citizens for Clean Air v. EPA*,
959 F.2d 839 (9th Cir. 1992) ..................................................23, 35

*City of Los Angeles v. Dickson*,
    2021 WL 2850586 (9th Cir. July 8, 2021) .....................................47

*D.C. v. United States Dep't of Agric.*,
    496 F. Supp. 3d 213 (D.D.C. 2020)...........................................42

*Eberle v. City of Anaheim*,
    901 F.2d 814 (9th Cir. 1990) ..............................................28, 41

*Galusha v. New York State Dept. of Envtl. Conservation*,
    27 F. Supp. 2d 117 (N.D.N.Y. 1998) .......................................45

*Gresham v. Azar*,
    950 F.3d 93 (D.C. Cir. 2020)..................................................29

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009)................................................49

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) .................................................49

*In re Pub. Emps. for Env't Resp.*,
    957 F.3d 267 (D.C. Cir. 2020)...................................8, 11, 14, 18

*Indep. Acceptance Co. v. California*,
    204 F.3d 1247 (9th Cir. 2000) ...............................................22

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health*
    *Admin.*, 626 F.3d 84 (D.C. Cir. 2010) ................................29, 49

*Keating v. F.A.A.*,
    610 F.2d 611 (9th Cir. 1979) .................................................30

*Mexican Gulf Fishing Co. v. United States Dep't of,*
    *Com.*, 60 F.4th 956 (5th Cir. 2023) ....................................29, 41

*Montalvo v. Spirit Airlines*,
    508 F.3d 464 (9th Cir. 2007) ...............................................24, 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................22, 30

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015) ........................................................................23

*Pub. Citizen, Inc. v. FAA*,
   988 F.2d 186 (1993) .....................................................................23

*Ranchers Cattlemen Action Legal Fund v. Dep't of Agric.*,
   415 F.3d 1078 (9th Cir. 2005) .................................................22, 30

*Safari Aviation Inc. v. Garvey*,
   300 F.3d 1144 (9th Cir. 2002) ...........................................29, 30, 40

*Sugar Cane Growers Coop. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ........................................................47

*Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, &*
   *Transportation Workers v. Fed. R.R. Admin.*, 988 F.3d 1170
   (9th Cir. 2021) ..............................................................................28

*United Food & Com. Workers Union, Loc. No. 663 v. United States*
   *Dep't of Agric.*, 532 F. Supp. 3d 741 (D. Minn. 2021) ................29

*United States v. Afshari*,
   426 F.3d 1150 (9th Cir. 2005) ......................................................47

*United States v. Alonso*,
   48 F.3d 1536 (9th Cir. 1995) .....................................35, 37, 44, 46

*United States v. Chapman*,
   146 F.3d 1166 (9th Cir. 1998) ................................................28, 41

*United States v. Zannino*,
   895 F.2d 1 (1st Cir. 1990) .............................................................37

## Statutes

5 U.S.C. § 702 ....................................................................................37

5 U.S.C. § 706 ....................................................................................22

42 U.S.C. § 4321 ..................................................................................6

42 U.S.C. § 4332 ...................................................................6

42 U.S.C. § 12101 ...............................................................45

49 U.S.C. § 40103 .................................................................5

49 U.S.C. § 40128 ........................ 3, 4, 5, 6, 7, 14, 16, 19, 23, 36, 44, 45

49 U.S.C. § 40128 note ....................................................4, 36

49 U.S.C. § 46110 ....................................................3, 45, 47, 48

54 U.S.C. § 100101 .............................................................5, 9

FAA Modernization and Reform Act of 2012,
    Pub. L. No. 112-95, 126 Stat. 11 (2012) ...................................7

FAA Reauthorization Act of 2024,
    Pub. L. No. 118-63, 138 Stat. 1025 (2024) ..............................36

Fiscal Responsibility Act of 2023,
    Pub L. No. 118-5, 137 Stat. 10 (2023) .....................................6

National Parks Air Tour Management Act,
    Pub. L. No. 106-181, 114 Stat. 61 (2000) .................................4

**Regulations and Other Authorities**

14 C.F.R. § 91.3 .................................................................32

14 C.F.R. § 91.137 ..............................................................15

14 C.F.R. Part 119 ..............................................................12

14 C.F.R. § 136.33 ...............................................................4

40 C.F.R. § 1501.3 ..............................................................36

40 C.F.R. § 1501.5 ................................................................6

40 C.F.R. § 1506.13 ..............................................................6

43 Fed. Reg. 55,978 (Nov. 29, 1978)........................................6

85 Fed. Reg. 55,060 (Sept. 3, 2020) ...................................................11

87 Fed. Reg. 23,453 (Apr. 20, 2022) ...................................................6

88 Fed. Reg. 31,840 (May 18, 2023) ...................................................13

# GLOSSARY

APA                 Administrative Procedure Act

ATMP           Air Tour Management Plan

FAA                 Federal Aviation Administration

NEPA           National Environmental Policy Act

NPS                 National Park Service

# INTRODUCTION

The National Parks Air Tour Management Act (the Management Act) requires the National Park Service (NPS) and the Federal Aviation Administration (FAA) to jointly develop air tour management plans (ATMPs) to mitigate adverse impacts of commercial air tours, such as helicopter tours, on units of the National Park System (parks). Commercial air tours—which often involve loud, repetitive helicopter noise—can have detrimental impacts on a park's natural and cultural resources, not to mention its visitor experience.

FAA and NPS (the Agencies) successfully completed an ATMP for Hawai'i Volcanoes National Park (the Park) in December 2023. Even though the Management Act allows the Agencies to prohibit all air tours over a park, the Agencies authorized more than 1,500 air tours over the Park each year—an average of almost 30 air tours per week. The ATMP mitigates air tours' adverse impacts on the Park's natural and cultural resources, Native Hawaiian sacred sites and ceremonial areas, Wilderness character, and visitor experience by, among other things, reducing the number of air tours and requiring air tours to follow designated routes and schedules.

Petitioners Helicopter Association International and Safari Aviation (Petitioners) argue that in issuing the ATMP, the Agencies failed to consider safety concerns raised in public comments about the ATMP's designated routes and

schedules. But the Agencies directly responded to these concerns. Petitioners' argument that the Agencies "ignored" public comments about safety fails to grapple with or even cite those portions of the record where the Agencies specifically addressed these comments. And FAA, exercising its expertise in aviation safety, conducted several rounds of safety review and reasonably determined that the ATMP was safe. The ATMP permits operators to deviate from designated routes to increase flexibility and safety, and the Agencies made multiple changes to the ATMP addressing safety concerns raised in public comments.

Petitioners also argue that the Agencies failed to consider public comments about the ATMP's purported impacts on elderly, disabled, and mobility-impaired persons' ability to experience the Park. But the Agencies addressed these comments and explained how NPS ensures access to the Park for all. Petitioners again entirely fail to grapple with the portions of the record where the Agencies responded to these comments. Nor was there any substantive legal requirement for the Agencies to change the ATMP to address Petitioners' concerns.

Ultimately, the Agencies appropriately responded to significant comments and considered all relevant factors in issuing the ATMP. Petitioners fail to demonstrate that the Agencies' approval of the ATMP was arbitrary or capricious, and the Court should deny the petition for review.

## STATEMENT OF JURISDICTION

(a)     FAA and NPS's Findings of No Significant Impact/Record of Decision (Record of Decision), which provides final agency determinations and approvals for the federal actions necessary to implement the ATMP for the Park, is a final FAA order.  1-ER-2.  This Court has exclusive subject matter jurisdiction to review the Record of Decision as a final FAA order.  49 U.S.C. § 46110(a); *see* 49 U.S.C. § 40128(b)(5) (confirming that an ATMP is subject to judicial review).

(b)     The Agencies issued the Record of Decision on December 20, 2023. 1-ER-77.  Petitioners timely petitioned for review within 60 days, on February 16, 2024.  *See* 49 U.S.C. § 46110(a); Docket No. 1.1.

## STATEMENT OF THE ISSUES

1.     Whether the Agencies adopting the ATMP was arbitrary or capricious, when:

    a.     the Agencies thoroughly considered public comments about safety throughout the ATMP development process and FAA made a reasoned determination that the ATMP is safe; and

    b.     the Agencies reasonably considered public comments about the ATMP's purported impacts on elderly, disabled, and mobility-impaired persons, and explained how the Park is accessible to all.

3

2.     Whether, if the Court ruled for Petitioners, remand without vacatur is the appropriate remedy, when the alleged errors Petitioners identify are minor and vacatur would have serious disruptive environmental consequences.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.     Statutory and regulatory background

In 2000, Congress enacted the National Parks Air Tour Management Act. Pub. L. No. 106-181, §§ 801-809, 114 Stat. 61, 185-94 (2000) (codified as amended at 49 U.S.C. § 40128 and note).  The Management Act requires operators wishing to conduct commercial air tours over certain National Park System units (parks)—or over tribal lands within or abutting parks—to apply to FAA for authority to conduct such tours.  49 U.S.C. § 40128(a)(2)(A); *see also id.* §§ 40128(a)(3), (a)(5), (e), (f).  FAA regulations define commercial air tours as flights "conducted for compensation or hire in a powered aircraft" where the purpose of the flight "is sightseeing over a national park, within 1/2 mile outside the boundary of any national park, or over tribal lands."  14 C.F.R. § 136.33(d).

As initially enacted, the Act provided that when an operator applies for authority to conduct tours over a park or tribal land, FAA, "in cooperation with" NPS, "shall establish an air tour management plan" (ATMP) for that park or tribal land. 49 U.S.C. § 40128(b)(1)(A). The Agencies' expertise complement one another in helping to develop the ATMP, given that FAA's mission is to "ensure the safety of aircraft and the efficient use of airspace," *id.* § 40103(b)(1), whereas NPS's mission is to conserve and provide for the enjoyment of "scenery, natural and historic objects, and wild life" in parks and to "leave them unimpaired for the enjoyment of future generations," 54 U.S.C. § 100101(a).

The objective of an ATMP is to develop "acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands." 49 U.S.C. § 40128(b)(1)(B). An ATMP "may prohibit commercial air tour operations over a national park in whole or in part." *Id.* § 40128(b)(3)(A). An ATMP may also "establish conditions for the conduct of commercial air tour operations over a national park, including commercial air tour routes, maximum or minimum altitudes, time-of-day restrictions, restrictions for particular events, maximum number of flights per unit of time, intrusions on privacy on tribal lands, and mitigation of noise, visual, or other impacts." *Id.* § 40128(b)(3)(B).

The Management Act sets forth a public process for developing an ATMP. *Id.* § 40128(b)(4). The Agencies must hold at least one public meeting with interested parties, publish a proposed ATMP in the Federal Register for notice and comment, and meet the procedural requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. *See* 49 U.S.C. § 40128(b)(4). In turn, NEPA requires federal agencies to prepare environmental impact statements before engaging in "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). However, not all agency actions have such significant environmental effects. To determine whether an agency action is expected to have a significant environmental effect, an agency may prepare an environmental assessment to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1501.5(c)(1).[1] Both FAA and NPS must approve an ATMP and its corresponding environmental decision

---

[1] In 1978, the Council on Environmental Quality issued regulations implementing NEPA, 43 Fed. Reg. 55,978 (Nov. 29, 1978). The Council published a new rule, effective September 14, 2020, 40 C.F.R. § 1506.13, which was amended in May 2022. *See* 87 Fed. Reg. 23,453 (Apr. 20, 2022). In June 2023, Congress also amended NEPA in the Fiscal Responsibility Act of 2023, Pub L. No. 118-5, § 321, 137 Stat. 10, 38-46 (2023). All citations in this brief are to the statute and regulations in effect as of December 2023, when the Agencies issued the Record of Decision. 1-ER-57.

document.  *See* 49 U.S.C. § 40128(b)(2) (providing that agency heads "shall each sign" the environmental decision document and record of decision for an ATMP).

To maintain the status quo until the Agencies could prepare ATMPs for parks, the Management Act provides that before establishing an ATMP, FAA "shall grant interim operating authority" to existing air tour operators that apply for prospective operating authority.  *Id.* § 40128(c)(1).  Congress fixed a formula for FAA to calculate this "interim operating authority," which is limited to the number of commercial air tour operations reportedly flown by an applicant-operator before the statute's enactment.  *Id.* § 40128(c)(2).  Interim operating authority terminates 180 days after the Agencies establish an ATMP.  *Id.* § 40128(c)(2)(E).

Because the Agencies initially struggled to complete ATMPs for parks, Congress amended the Management Act in 2012.  *See* FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 501, 126 Stat. 11, 100-03 (2012). Among other changes, Congress: (1) exempted parks with 50 or fewer flights from the requirement to prepare an ATMP; (2) required air tour operators to annually report to the Agencies the number of air tours they flew; and (3) allowed the Agencies to enter into voluntary agreements with operators at a park rather than develop an ATMP.  49 U.S.C. §§ 40128(a)(5)(A), (a)(5)(D), (b)(7).

Subsequent to this amendment, the Agencies completed voluntary agreements only for a few parks but did not complete any ATMPs.  In May 2020,

7

the D.C. Circuit held that the Agencies have a mandatory duty under the Management Act to jointly establish ATMPs (or voluntary agreements) for non-exempt parks. *See In re Pub. Emps. for Env't Resp.* (*PEER*), 957 F.3d 267, 273 (D.C. Cir. 2020). That court issued a mandamus order requiring the Agencies to set a schedule to timely bring twenty-three eligible parks, including Hawai'i Volcanoes National Park, into compliance with the Management Act either by issuing an ATMP or by entering into voluntary agreements with operators. *See id.* at 275-76; 1-ER-6. Consistent with that mandamus order, the Agencies committed to complete an ATMP for Hawai'i Volcanoes National Park no later than December 31, 2023. 1-ER-7.

## B.    Factual background

### 1.    Hawai'i Volcanoes National Park

Hawai'i Volcanoes National Park (the Park), originally established by Congress in 1916, is located on the southern end of the Island of Hawai'i, the largest and southernmost island of the Hawaiian Archipelago. 1-ER-2-3. The Park contains Mauna Loa, the largest active volcano in the world, and Kīlauea, a volcano creating the newest land in the Hawaiian Islands chain. 1-ER-3. The purpose of the Park is to "protect, study, and provide access to Kīlauea and Mauna Loa," and to "perpetuate endemic Hawaiian ecosystems and the traditional Hawaiian culture connected to these landscapes." SER-67, 73 (citing Park's

"Foundation Document").  NPS must manage the Park to "conserve the scenery, natural and historic objects, and wild life" therein, "unimpaired for the enjoyment of future generations," 54 U.S.C. § 100101(a), and may not take any action that would "lead to an impairment of park resources and values," SER-112.  A map of the Park is included below.  SER-87.



Figure 1.3  Existing Conditions, Full Park
Hawai'i Volcanoes National Park GMP/WS/EIS

The Park comprises 354,461 acres of public land, which includes more than 120,000 acres of federally designated Wilderness, and more than 140,000 acres of lands NPS manages as Wilderness based on those lands' eligibility for a Wilderness designation.  1-ER-2-4.  NPS manages Wilderness to "preserve and

protect wilderness characteristics and values in perpetuity," SER-93, consistent with NPS's 2006 Management Policies and the Wilderness Act, SER-74.

The Park also contains unique and fragile ecological habitats with diverse native plants and animals, including many endangered and threatened species. 1-ER-2-3. Hawaiian plants and animals have evolved in almost complete isolation for the past 30 million years, which means that more than 90% of the native terrestrial flora and fauna in Hawai'i are endemic to the islands—they do not occur in other areas of the world. 1-ER-3. And the Park's volcanic topography creates large variations in precipitation that sustain different populations of plant and animal communities across seven ecological life zones. 1-ER-4. As a result, the Park provides habitat for sixty-two federally listed endangered or threatened species, many of which are noise-sensitive species, and nine species proposed for listing. 1-ER-3. Among these species are the nēnē, the threatened Hawai'i state bird, the 'akiapōlā'au and the 'i'iwi, the endangered and threatened (respectively) Hawaiian honeycreeper bird species, and the 'ilio holo i ka uaua, the endangered Hawaiian monk seal. 1-ER-3; SER-54-56, 62-63.

The Park likewise is an important home for Native Hawaiian culture, and it preserves and interprets the history of human development in the Hawaiian Islands. Beginning at least five centuries ago, Native Hawaiians lived, worked, and worshipped on sacred grounds now within the Park, and today the Park protects

ancient villages, petroglyphs, stone walls, and footpaths. 1-ER-3. Native

Hawaiian practitioners perform ceremonies at sacred sites within the Park and have

consistently noted that these ceremonies require silence and rely on hearing natural

sounds. 1-ER-20. In addition, adventurers, explorers, scientists, and

philanthropists visited the Park in the eighteenth, nineteenth, and early twentieth

centuries, and the Park accordingly protects historic housing districts, historic

structures, and historic roads. 1-ER-3. The Park is one of the few places in the

world that the United Nations Educational, Scientific, and Cultural Organization

has designated as both a "World Heritage Site" and "Biosphere Reserve." 1-ER-4.

### 2. The Agencies' process for developing the ATMP

After Congress enacted the Management Act in 2000, FAA granted interim

operating authority to the Park's existing air tour operators. 1-ER-7. The

Agencies then began developing an ATMP for the Park in 2003 but paused that

process after the 2012 amendments to the Management Act. 1-ER-6. Following

the D.C. Circuit's mandamus decision, *In re PEER*, 957 F.3d 267, the Agencies

began a new ATMP planning process in September 2020, 1-ER-6, *see* 85 Fed. Reg.

55,060 (Sept. 3, 2020).

At the beginning of the new ATMP planning process, the Agencies

identified the existing conditions of commercial air tours over the Park. 1-ER-7.

To measure the current level of commercial air tours, the Agencies relied on a

three-year average of flights conducted under interim operating authority from 2017 to 2019, which reflected the most reliable recent air tour data reported by air tour operators before the COVID-19 pandemic disrupted travel patterns. 1-ER-7-8.  Within this period, operators conducted an average of 11,376 commercial air tours per year.  1-ER-8.[2]  To identify current air tour routes and operating conditions in the Park, the Agencies relied on route information provided by commercial air tour operators and electronic flight tracking data.  *Id.*

Using the data before them, the Agencies developed preliminary ATMP alternatives.  1-ER-11.  FAA reviewed all preliminary ATMP alternatives and justifications for restrictions on commercial air tours, and FAA's local Flight Standards District Office (District Office) reviewed the alternatives' routes and specifications for aviation safety concerns.  1-ER-11.  The District Office is FAA's field office based in Honolulu responsible for flight safety matters, such as surveillance and certification of flight operations and enforcing Federal Aviation Regulations.[3]

---

[2] This figure is substantially lower than the number of flights FAA authorized under interim operating authority.  As of December 2023, eight air tour operators held interim operating authority to conduct 24,880 air tours per year.  1-ER-8.

[3] *See* 14 C.F.R. Part 119; Federal Aviation Administration, *Flight Standards District Offices*, https://www.faa.gov/about/office_org/field_offices/fsdo (last visited Aug. 21, 2024).

In February 2022, the Agencies began a public scoping process under NEPA for developing an ATMP. 1-ER-12. The Agencies notified the public of, among other things, four different ATMP alternatives, including the particular routes, altitudes, time-of-day restrictions, restrictions for particular events, and maximum numbers of flights associated with each alternative that would allow air tours. 1-ER-12. The Agencies received nearly a thousand public comments during the scoping process, and modified the alternatives carried forward for further analysis based on those comments. 1-ER-12-13.

In May 2023, the Agencies notified the public that a draft environmental assessment and draft ATMP were available for review and comment. 1-ER-40; *see also* 88 Fed. Reg. 31,840 (May 18, 2023). The draft ATMP, which FAA's District Office reviewed for aviation safety concerns, proposed limiting the annual number of air tours over the Park, and designated proposed routes and scheduling parameters for the tours. 1-ER-13. The draft environmental assessment analyzed three ATMP alternatives corresponding with alternatives outlined in the scoping notice, although the Agencies had dismissed one alternative originally included in the scoping notice based on public comments. 1-ER-13-14. The Agencies held a public meeting on the draft environmental assessment and draft ATMP in June 2023, and received 5,447 public comments, although two form letters comprised 5,290 of the comments. 1-ER-40.

On December 20, 2023, the Agencies issued the Record of Decision. 1-ER-57. That decision: (1) approved and adopted a revised, final ATMP, *id.*; (2) found that the final ATMP would not have significant environmental effects based on a revised, final environmental assessment, 1-ER-56; and (3) determined that the final ATMP's air routes were safe, 1-ER-48, 57. In reaching their decision, the Agencies comprehensively reviewed and analyzed public comments, and made changes to the ATMP in response to those comments. 1-ER-40, 43-46. The Agencies also summarized and responded to public comments received on the draft ATMP and draft environmental assessment in the "Comment Summary Report," located in Appendix L to the final environmental assessment. SER-4-40. The Agencies attached the Comment Summary Report to the Record of Decision and explicitly incorporated the Comment Summary Report into the Record of Decision by reference. 1-ER-46.

### 3. The Agencies' decision adopting the ATMP.

The Agencies adopted the final ATMP to meet the Management Act's requirement to mitigate or prevent significant adverse impacts of commercial air tour operations on the Park's natural and cultural resources, Native Hawaiian sacred sites and ceremonial areas, Wilderness character, and visitor experience, as well as to comply with the D.C. Circuit's mandamus order in *In re PEER*. *See* 49 U.S.C. § 40128; 1-ER-11, 46. Rather than prohibiting all air tours over the Park,

14

the ATMP permits operators to conduct 1,548 air tours per year along three designated routes.  1-ER-49-51.[4]  Those routes avoid the most significant adverse impacts to the Park's resources by diverting flights away from the summit of Kilauea, cultural and visitor use areas, designated Wilderness, and key avian habitat.  1-ER-49-50.  But at the same time, the routes provide desirable views for air tour patrons.  *Id.*  The Puʻuʻōʻō Route provides views of a historically active volcanic area, the Kahuku Route provides views of Mauna Loa, and the Coastal Route provides views of the Park's coastal areas.  1-ER-50-51.  While the Agencies cannot predict the precise location of future volcanic activity and eruptions, it is very likely that future volcanic activity and eruptions will be visible from the routes, or from air tours outside the area covered by the ATMP.  1-ER-65; SER-23.[5]

The ATMP's designated routes reflect modest limits on air tour operators' flight patterns.  On all routes except the Coastal Route, the ATMP sets flight paths

———————————————

[4] Petitioners compare the number of air tours permitted under the ATMP to the maximum number of air tours operators could conduct under interim operating authority, *see* Opening Br. 11, rather than the "existing condition" of the number of air tours operators actually conducted under interim operating authority, 1-ER-7-8. The three-year average of operator-reported air tours under interim operating authority was 11,376 annual tours, which is only 46% of the 24,880 tours operators most recently could conduct under interim operating authority.  1-ER-7-8.

[5] If a volcanic eruption affects the routes, FAA could issue temporary flight restrictions to protect persons and property on the surface or in the air.  *See* 14 C.F.R. § 91.137.

that are a half-mile wide. 1-ER-64. The Coastal Route requires a 2,000-foot lateral offset (buffer) from shore, which protects Wilderness, cultural, and sensitive coastal resources, including the endangered Hawaiian monk seal. 1-ER-50-51, 64-65; SER-62-63. All routes have designated minimum altitudes and directions of flight. 1-ER-64-65. Because hovering, loitering, and circling prolong a helicopter's noise impacts and "could negatively impact visitor experience and cultural and natural resources," 1-ER-50, those flight patterns are prohibited, except on the Puʻuʻōʻō Route where they are subject to limits, 1-ER-64. The ATMP confirms that air tour operators always have discretion to deviate from designated flight paths, altitudes, and restrictions "as necessary for safe operation of an aircraft." 1-ER-65. Operators are required to return to the designated routes once it is "safely possible" to do so. 1-ER-65.

To protect the Park's natural and cultural resources, the ATMP also imposes scheduling parameters on air tours. Air tours must operate between 10:00 a.m. and 2:00 p.m., unless aircraft qualify for a quiet technology incentive, because ample quiet time surrounding sunrise and sunset are necessary to protect wildlife such as endangered birds, as well as Native Hawaiian traditional cultural practices and the Park's visitor experience. 1-ER-51.[6] In addition, the ATMP bars flights on eight

---

[6] Qualifying quiet technology aircraft may operate from 9:00 a.m. to 5:00 p.m. 1-ER-69. The Management Act requires the Agencies to provide quiet-technology incentives, such as "relief from caps and curfews." 49 U.S.C. § 40128(b)(3)(D).

days per year that are important to Native Hawaiians, 1-ER-44-45, permits only quiet technology aircraft to fly on Wednesdays, and bars flights on Sundays in consideration of requests from the local community and Native Hawaiian cultural practitioners, 1-ER-52.

The ATMP also reflects FAA's comprehensive review of the final ATMP's routes and conditions to "identify and address" safety concerns. 1-ER-48. FAA reviewed all public comments on the draft ATMP that raised safety concerns, and the Agencies accordingly modified numerous ATMP provisions in response to public comments about aviation safety. 1-ER-43-45, 49-50; SER-31. Among those changes, the Agencies (1) added in-flight communication requirements for pilots to enhance pilots' situational awareness, 1-ER-45, and (2) set distinct minimum altitudes for different directions of flight on the Coastal Route to vertically separate aircraft, 1-ER-44, 50. In addition, while the draft ATMP provided only an annual limit on the number of air tours each operator could conduct, in the final ATMP the Agencies set a limit on the number of tours each operator could conduct in a single day to reduce aircraft congestion and to ensure safety. 1-ER-45. FAA determined that daily limits "were necessary to address safety concerns." 1-ER-49. Based on this process FAA found that there was a

---

The ATMP outlines a process for an operator to qualify for this exemption. 1-ER-69.

"reasonable and safe basis for the ATMP," 1-ER-48, and NPS relied on FAA's safety determination, 1-ER-57.

Finally, the Agencies adopted the final ATMP over a number of other alternatives that the Agencies studied in their environmental assessment but reasonably eliminated. The Agencies considered a no-action alternative of maintaining interim operating authority, which Petitioners advocate for here, *see* Opening Br. 39, and would result in an average of 11,376 commercial air tours per year, 1-ER-14, 46.[7] But the Agencies did not select this alternative because they found that maintaining interim operating authority would violate the Management Act, *see* 1-ER-14; *see also In re PEER*, 957 F.3d at 275-76, and would cause "unacceptable impacts" to the Park's resources, 1-ER-46. On that score, NPS explained how loud, frequent helicopter noise under interim operating authority would harm the physiology, pairing and breeding success, and territory size of the Park's endangered and threatened Hawaiian birds, SER-51, and would also harm Native Hawaiian sacred sites and traditional cultural practices, designated Wilderness areas, and visitor activities, SER-50-51.

In addition, the Agencies considered alternatives that would allow more than the ATMP's roughly 1,500 air tours per year but less than the existing condition of

---

[7] This number is based on the three-year average of operator-reported air tours from 2017 to 2019, which shows that operators have flown substantially fewer tours than interim operating authority authorizes. 1-ER-7-8.

11,376 air tours per year.  SER-52.  However, NPS explained based on the
Agencies' noise modeling analysis that authorizing more air tours than permitted
by the ATMP would "continue to result in severe noise impacts that would
preclude the Park from adequately protecting visitor experience, biological
resources, and Wilderness character."  SER-52.

And the Agencies considered an alternative that would prohibit all
commercial air tours over the Park, which the Management Act expressly permits.
1-ER-47; *see* 49 U.S.C. § 40128(b)(3)(A).  But the Agencies did not select that
alternative because the measures in the ATMP, including annual air tour limits,
daily air tour limits, designated routes, and minimum altitudes, sufficiently
mitigate the impacts of air tours on Park resources while still providing an
opportunity for commercial air tours.  1-ER-47.  In other words, the Agencies
found that banning air tours over the Park was unnecessary because the ATMP
"strike[s] the appropriate balance between mitigating impacts on Park resources
and visitor experience while still providing opportunities for commercial air tours
to occur."  1-ER-48.

## SUMMARY OF ARGUMENT

1.     The Agencies reasonably responded to significant public comments
and considered all relevant factors when they adopted the ATMP.  Their decision
to approve the ATMP was not arbitrary or capricious.

a. The Agencies adopted the ATMP after comprehensively responding to comments about safety and based on FAA's reasoned determination that the ATMP is safe. In response to safety concerns raised in public comments, the Agencies explained that FAA conducted a comprehensive safety review of the ATMP, and that the ATMP gave pilots discretion to deviate from flight paths if necessary to avoid any safety issues. The Agencies, relying on FAA's expertise, also made numerous changes to the ATMP to bolster safety, including changes that responded to safety concerns raised in public comments.

Petitioners broadly claim that the Agencies ignored public comments raising safety issues, but Petitioners fail to grapple with or even cite those parts of the record where the Agencies directly responded to these comments. Because the record disproves Petitioners' general safety argument, the Court should reject it. And as to Petitioners' more specific arguments about FAA's safety determinations, the Court should defer to FAA's technical expertise and judgment. FAA carefully considered all relevant safety issues raised in public comments, including concerns about changing weather patterns and route restrictions, before determining that the ATMP was safe.

b. The Agencies also reasonably considered public comments about the ATMP's purported impacts to elderly, disabled, and mobility-impaired persons, and explained how NPS ensures that the Park is accessible to all. As with

20

their safety argument, Petitioners contend that the Agencies completely ignored impacts to elderly, disabled, and mobility-impaired persons but once again fail to grapple with those parts of the record where the Agencies directly responded to these concerns.

To the extent that Petitioners make a substantive argument that the Management Act required the Agencies to change the ATMP to limit purported "significant impacts" to elderly, disabled, and mobility-impaired persons who may wish to take an air tour over the Park, the statute provides no basis for that argument. Petitioners have also forfeited any substantive argument about accessibility under any other federal law. And in all events, Petitioners overlook that the Park has ample accessible ground facilities and that the ATMP still permits more than 1,500 air tours per year.

2. Even if the Court rules for Petitioners, remand without vacatur would be the appropriate remedy. Because Petitioners primarily argue that the Agencies could have better responded to particular public comments, any such errors are minor because the Agencies could easily remedy those errors on remand with further explanation. The disruptive consequences of vacating the ATMP would also outweigh the seriousness of any possible agency errors because restoring interim operating authority would impose unacceptable impacts on the environment and Park visitors.

## STANDARD OF REVIEW

Because the Management Act does not provide a private right of action, this Court reviews the Agencies' compliance with that statute under the Administrative Procedure Act's (APA) arbitrary and capricious standard, 5 U.S.C. § 706(2)(A). *See All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 491 (9th Cir. 2023). Arbitrary and capricious review of an agency's decision is "highly deferential" and "presume[s] the agency action to be valid." *Indep. Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir. 2000). The standard is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency must only "articulate a satisfactory explanation for its action," including a "rational connection between the facts found and the choice made." *Id.* (cleaned up). Courts assess "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (cleaned up). Deference to the agency's decision is particularly appropriate where, as here, "the agency's decision involves a high level of technical expertise." *Ranchers Cattlemen Action Legal Fund* (*R-CALF*) *v. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005).

## ARGUMENT

I. **The Agencies reasonably considered all relevant factors and responded to significant comments when they adopted the ATMP.**

In the Management Act, Congress directed the Agencies to publish a draft ATMP in the Federal Register for notice and comment, 49 U.S.C. § 40128(b)(4)(B), and the Agencies did so, 1-ER-40. The Agencies' responsibility to respond to the comments the Agencies received on the draft ATMP is not meant to be "particularly demanding." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (1993). The Agencies need only "consider and respond to *significant* comments received during the period for public comment." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (emphasis added). Significant comments are "those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule," *Altera Corp. & Subsidiaries v. Commissioner of Internal Revenue*, 926 F.3d 1061, 1081 (9th Cir. 2019) (cleaned up), or those which "step over a threshold requirement of materiality," *Citizens for Clean Air v. EPA*, 959 F.2d 839, 845 (9th Cir. 1992). "The failure to respond to comments is grounds for reversal only if it reveals that the agency's decision was not based on consideration of the relevant factors." *Am. Min. Cong. v. U.S. E.P.A.*, 965 F.2d 759, 771 (9th Cir. 1992).

Contrary to Plaintiffs' arguments, the Agencies reasonably responded to significant comments and considered the relevant factors when they approved the

ATMP. Specifically, Petitioners contend that the Agencies ignored safety and accessibility issues raised in public comments, *see* Opening Br. 19, but the record shows that the Agencies did consider and address both issues.

**A. The Agencies reasonably addressed public comments about safety, and FAA rationally determined that the ATMP is safe.**

The record shows that FAA, our nation's "sole arbiter of air safety," *Montalvo v. Spirit Airlines*, 508 F.3d 464, 472 (9th Cir. 2007), conducted an extensive safety review of the ATMP and appropriately found that the ATMP is safe. The Agencies, relying on FAA's expertise, directly responded to relevant public comments on the Draft ATMP about safety in the Comment Summary Report, where they explained how the ATMP provided for safety, including the modifications the Agencies made to bolster safety in response to public comments. SER-4, 31-32. Petitioners' arguments to the contrary fail to even acknowledge FAA's careful safety analysis and the Agencies' responses to comments reflected in the record. *See* 1-ER-11, 13, 43-46, 48-50, 57, 72; SER-31-32.

**1. The Agencies' analysis of safety and response to public input about safety issues was reasonable.**

a. FAA thoroughly reviewed safety during three phases of the ATMP development process. FAA's District Office (responsible for aviation safety in the region) reviewed the preliminary ATMP scoping alternatives for aviation safety concerns. 1-ER-11. Then FAA reviewed the draft ATMP, including its proposed

restrictions on commercial air tours, for aviation safety concerns. 1-ER-13. And FAA reviewed the final ATMP to identify and address any remaining aviation safety concerns. 1-ER-48.

In addition, FAA "reviewed all public comments received on the draft ATMP that raised safety concerns," and reasonably considered the issues raised in those comments. 1-ER-48. Relying on FAA's expertise, the Agencies then changed the final ATMP in response to those comments. SER-31-32. The Agencies' Comment Summary Report summarized commenters' concerns about the draft ATMP's "set routes and altitudes," including how "common routes" allegedly would "force aircraft into potentially unsafe flight conditions" and purportedly do not "account for weather patterns common in the area." SER-31. In response, the Agencies outlined how FAA's District Office had "reviewed the substantive safety related public comments, along with routes and altitudes that would be authorized by the ATMP" and determined that the ATMP was safe. SER-31. The Agencies also explained that the ATMP provides for safe flying conditions by allowing operators to deviate from the designated routes "as necessary for safe operation of an aircraft" per FAA regulations, and by specifying that pilots must "safely exit the route" if they encounter weather that does not allow them to proceed. SER-31-32.

The Agencies further explained that FAA's District Office made "additional changes to flight route requirements to further ensure safety" in response to these safety comments. SER-31. For example, the District Office recommended and the Agencies adopted different minimum altitudes for helicopters flying in opposite directions on the Coastal Route to vertically separate aircraft and "deconflict the airspace." 1-ER-43-44, 50; *see also* 1-ER-72. The District Office also recommended and the Agencies adopted additional in-flight communication requirements for pilots entering or departing all routes, such as requiring pilots to identify the name and location of the route, the direction of travel, and altitude, to enhance pilots' "situational awareness." 1-ER-67-68; *see* 1-ER-45. Separately, the Agencies modified the draft ATMP to cap the number of tours operators could conduct each day, resulting in ordinarily five or fewer tours per flight day across the ATMP's three routes. 1-ER-49, 68-69. FAA determined that daily limits on flights were necessary to address safety concerns, and concluded that the ATMP's specific limit was safe. 1-ER-49.

Based on FAA's safety review throughout the development of the ATMP, FAA's review and response to public comments, and the Agencies' adoption of the District Office's recommendations, FAA appropriately determined that there was a "reasonable and safe basis" for approving the final ATMP. 1-ER-48. FAA—and NPS, relying on FAA's expertise—accordingly concluded based on the whole

record that the final ATMP fulfilled the goal of "aviation safety." 1-ER-57. The Agencies' treatment of safety, as well as their responses to significant public comments about safety, fully met the APA's procedural requirements. *Am. Min. Cong.*, 965 F.2d at 771.

b. Petitioners' argument that the Agencies purportedly "failed to evaluate" and "ignored" safety issues raised in comments cannot be squared with this record. Opening Br. 19; *see also* Opening Br. 24-25, 29. Petitioners flyspeck the Record of Decision to argue that the Agencies' conclusions about safety are perfunctory. *See* Opening Br. 24-25. But Petitioners nowhere cite or engage with the Comment Summary Report, which the Record of Decision incorporates by reference. *See* 1-ER-46; SER-4. That report plainly shows that the Agencies appropriately identified and responded to significant public comments on safety. SER-31-32. Petitioners also ignore those portions of the Record of Decision which detail the Agencies' multiple changes to the final ATMP designed to address safety concerns raised in public comments. 1-ER-45-50.

Because Petitioners fail to grapple with these key parts of the administrative record, the Court should reject their arguments that the Agencies did not consider this issue. *See Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Com.*, 792 F.3d 1027, 1034 (9th Cir. 2015) (rejecting argument that agency did not consider economic impacts as "belied by the administrative record"); *United States v.*

*Chapman*, 146 F.3d 1166, 1172 (9th Cir. 1998) (rejecting argument that agency failed to address regulatory factors when "the administrative record refutes this assertion"). Nor should the Court accept any new arguments Petitioners seek to inject in their reply brief about the Comment Summary Report or FAA's changes to the final ATMP, because Petitioners may not raise new arguments for the first time in a reply brief. *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) ("The general rule is that appellants cannot raise a new issue for the first time in their reply briefs." (cleaned up)). And if Petitioners attempt to argue that the Record of Decision does not incorporate the Comment Summary Report, that argument is incorrect and similarly forfeited. *See id.*; 1-ER-46.

Given Petitioners' failure to confront the record, the cases Petitioners rely on in support of their argument that FAA ignored safety considerations are inapposite. *See* Opening Br. 23-34, 28-29. For example, Petitioners cite *Transportation Division of the International Association of Sheet Metal, Air, Rail, & Transportation Workers v. Federal Railroad Administration*, 988 F.3d 1170 (9th Cir. 2021), where the agency's failure to respond to a petitioner's comments and evidence about the safety of one-person train crews revealed that the agency did not address the relevant factor of safety in promulgating a maximum one-person train crew rule, *id.* at 1182-83. The other cases cited by Petitioners rely on that same principle, where the agency's failure to respond to significant comments

demonstrated that the agency did not consider a relevant factor. *See, e.g.*, *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010) (holding that responding in a "conclusory manner" to comments about a "central factual dispute" was arbitrary and capricious).[8]

This case is completely different. To begin with, the Agencies reviewed and responded to significant comments about safety in the Comment Summary Report. *See* SER-31-32. The Agencies also thoroughly ensured the safety of the ATMP by, among other things, having FAA repeatedly review the ATMP, designing the ATMP to permit operators to deviate from designated routes, and making numerous changes to flight routes and requirements in response to public comments. *See id.*

Rather, this case bears a strikingly resemblance to *Safari Aviation Inc. v. Garvey*, 300 F.3d 1144, 1147 (9th Cir. 2002). There, Safari Aviation petitioned for review of FAA's various new safety requirements for Hawai'i air tour operators,

---

[8] Petitioners cite many more cases for this same proposition. *See Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *vacated and remanded sub nom. Becerra v. Gresham*, 142 S. Ct. 1665 (2022) ("[T]he Secretary's analysis of the substantial and important problem is to note the concerns of others and dismiss those concerns in a handful of conclusory sentences."); *Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 972–73 (5th Cir. 2023) (holding that government "did not address" the "significant issue" of privacy concerns); *United Food & Com. Workers Union, Loc. No. 663 v. United States Dep't of Agric.*, 532 F. Supp. 3d 741, 773-76 (D. Minn. 2021) (holding that agency erred in failing to consider the relevant factor of worker safety, an issue raised in comments).

and argued that FAA failed to meaningfully review comments that disputed

whether those requirements actually improved safety. *Id.* at 1147. This Court

denied the petition because FAA "acknowledged the comments identified by

[Petitioner] and provided a reasoned response which demonstrated that its action

was based on relevant safety considerations." *Id.* at 1151. Here too, the Agencies

provided a reasoned response to public comments about safety and explained in the

Comment Summary Report that they adopted the ATMP based on relevant safety

considerations. *See* SER-31-32. Nothing more was required.

### 2. Petitioners' remaining safety arguments fail.

If the Court reaches Petitioners' more specific arguments that the Agencies

purportedly failed to address particular safety issues raised in comments, *see*

Opening Br. 20-22, 24-27, the Court should reject Petitioners' invitation to second-

guess FAA's expert judgment that the ATMP was safe. The Court "is not to

substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

Indeed, deference is particularly warranted here because Congress intended FAA

to be our nation's "sole arbiter of air safety," *Montalvo*, 508 F.3d at 472, and

FAA's safety findings involve "a high level of technical expertise," *R-CALF*, 415

F.3d at 1093. Courts routinely defer to FAA on aviation safety matters. *See*

*Keating v. F.A.A.*, 610 F.2d 611, 613 (9th Cir. 1979) (deferring to "expertise of the

[FAA]" on issues of "aerospace medicine" in denying petition for exemption from

pilot age rule); *Aerial Banners, Inc. v. F.A.A.*, 547 F.3d 1257, 1261–62 (11th Cir. 2008) (finding that a determination about "aviation safety" is "precisely the sort of discretionary judgment where we should defer to the FAA's expertise.").

Petitioners incorrectly argue that the Agencies' "only answer" to comments raising safety concerns about the ATMP's "routes, altitudes and times," is that "safety is the pilot's responsibility." Opening Br. 25. To the contrary, the Agencies addressed these safety concerns by having FAA and its District Office review the ATMP's "routes and altitudes" to ensure the ATMP was safe. SER-31. The Agencies, relying on FAA's expertise, also modified minimum altitudes on the Coastal Route to deconflict that airspace, added in-flight communication requirements to enhance pilots' situational awareness, and implemented daily tour caps to limit the number of tours on each of the ATMP's routes. 1-ER-44-45, 49-50; SER-31.

The Agencies likewise appropriately explained that operators help ensure airspace safety. Here, the Agencies clarified that operators may deviate from the ATMP's designated routes and altitudes "as determined under Federal Aviation Regulations requiring the pilot-in-command to take action to ensure the safe operation of the aircraft." SER-31; *see* 1-ER-65. That determination accords with the Federal Aviation Regulations, which have long imposed a similar rule giving discretion to *all* aircraft operators, irrespective of whether they are flying in the

31

airspace above parks, to deviate from existing airspace rules to ensure safety. *See, e.g.*, 14 C.F.R. § 91.3 (providing that the pilot in command is "the final authority" as to "the operation of [an] aircraft" and may "deviate from any rule of this part to the extent required" in response to "an in-flight emergency requiring immediate action"). Operators' safety responsibilities regarding the operation of their aircraft under FAA's longstanding regulations are an important aspect of aviation safety. Indeed, the pilots' ability to deviate from the minimum required flight altitude and other route requirements is important flexibility, and it allows pilots to deal with emerging safety conditions—such as changing weather patterns. Petitioners are wrong that this flexibility is missing from the ATMP.

Petitioners similarly attack the ATMP as too restrictive because it provides that, if an operator deviates from a flight path, the "pilot-in-command should return to designated route and altitude as soon as safely possible after [a] hazard has passed." 1-ER-65; *see* Opening Br. 25 (arguing that pilots are "confined" to routes). But that provision does not raise any significant safety issues. It expressly acknowledges that aircraft safety should be prioritized over strict adherence to flight paths when necessary, because it clarifies that operators should only return to flight paths when it is "*safely possible*" to do so. 1-ER-65 (emphasis added). That Petitioners might also like to be able to deviate from these designated routes even

32

when not necessary for safety is a matter of tour operators' commercial preferences, not one of aviation safety.

Petitioners also argue that the Agencies ignored the impacts of "ever-changing weather patterns" on the ATMP's routes, Opening Br. 25, but the Agencies reasonably responded to these weather concerns in the Comment Summary Report. Relying on FAA's expertise, the report clarified that "if pilots are on or entering a route and encounter weather that does not allow them to proceed further along the route at the prescribed altitude, they must safely exit the route and either follow another route where weather conditions allow or exit the [area covered by the ATMP]." SER-31-32.

Related to this concern about weather, Petitioners suggest because "pilots are confined to flying between 10:00 a.m. and 2:00 p.m.," they will not be "able to shift the time of a tour to the safest time of day in light of potential weather issues." Opening Br. 26.[9] But that argument ignores the Agencies' explanation and FAA's longstanding rule that "the pilot-in-command" is required "to take action to ensure the safe operation of the aircraft." SER-31. If there is dangerous weather on the designated route that the operator intends to fly, the operator must fly at another time permitted by the ATMP or not fly at all that day. Petitioners

---

[9] Petitioners fail to acknowledge that quiet technology aircraft may fly from 9:00 a.m. to 5:00 p.m. 1-ER-69.

have not pointed to any regulatory authority requiring the Agencies to address these safety concerns by readjusting flying times to accommodate Petitioners' desire to fly tours on days with unfavorable weather during the authorized flight times.

Furthermore, Petitioners argue that the Agencies should have considered the safety impact of FAA's potential future enforcement of the ATMP's route requirements, *see* Opening Br. 26, but that was not a "significant" comment that the Agencies needed to consider, *Altera Corp.*, 926 F.3d at 1080. Petitioners' argument appears to be based on the mistaken assumption that the ATMP's flight paths are too restrictive and do not allow deviations for safety reasons. *See* Opening Br. 26. Yet the ATMP expressly permits deviations within the ATMP's designated flight paths. 1-ER-64. Two of the ATMPs' flight paths are a half-mile wide, *id.*; the third flight path, the Coastal Route, requires only a 2,000 foot lateral offset from shore but allows operators to fly further from shore; 1-ER-64-65; and all flight paths impose only a minimum required altitude, *id.*

And as explained above, the ATMP expressly allows operators to deviate from the designated flight paths "as necessary for safe operation of an aircraft." 1-ER-65. This means that an operator may fly outside a flight path, so long as that deviation is limited to what is necessary for safe operation of the aircraft and the operator returns to the designated route at altitude as soon as safely possible. *Id.*

Moreover, the ATMP's "adaptive management" provisions allow the Agencies to make minor modifications to routes, altitudes, or other operating parameters if FAA determines there is a need for such changes due to "safety concerns," which is intended to address any unforeseen issues with these routes and altitudes. 1-ER-75. In any event, given that the Agencies ensured that the ATMP was safe, the Agencies monitoring operators' compliance with the ATMP could not create any aviation safety issues. *See* 1-ER-44-45, 49-50.

Petitioners might argue that there are even more issues raised in comments that FAA failed to consider, given that Petitioners' brief contains a bullet-list of comments copied from the administrative record. *See* Opening Br. 20-22. But Petitioners have failed to demonstrate how any of these comments meet a "threshold requirement of materiality," *Citizens for Clean Air*, 959 F.2d at 845, and FAA was under "no obligation" to respond to "all the specific issues raised in comments," *Alvorada Community. Hosp v. Shalala*, 155 F.3d 1115, 1122 (9th Cir. 1998) (cleaned up); *see United States v. Alonso*, 48 F.3d 1536, 1544 (9th Cir. 1995) (an issue given only "perfunctory treatment" in an appellant brief need not be considered).[10]

---

[10] Many comments regarding safety that Petitioners quote in their Opening Brief were submitted during the public scoping process, *see* Opening Br. 20-22, and so are not even reasonably related to the routes and altitudes outlined in the draft ATMP and refined in the final ATMP.

Even if the Court reaches some of these more tangential issues, the Agencies either already considered or were not required to consider these issues. For example, Petitioners assert that the Agencies did not consider "the history of the routes flown by local companies for many years," Opening Br. 25, but the record demonstrates that the Agencies studied operators' historic flight paths in developing the ATMP, *see* 1-ER-8, 10; SER-64-66. Petitioners also argue that that the Agencies should have consulted the National Parks Overflight Advisory Group in developing the Park's ATMP. *See* Opening Br. 20. But that was not required because Congress only amended the Management Act to require the Agencies to consult the advisory group under 49 U.S.C. § 40128(b)(4)(E) in May 2024, after the Agencies approved the Record of Decision in December 2023. *See* FAA Reauthorization Act of 2024, Pub. L. No. 118-63, § 628, 138 Stat. 1025, 1243-44 (2024); 1-ER-57.[11]

Finally, to the extent that Petitioners attempt to allege NEPA claims, those claims fail. Petitioners cite to NEPA to argue that safety was a "significant issue" that FAA was required to consider. *See* Opening Br. 23 (citing 40 C.F.R. § 1501.3(b)(2)(iii)). Petitioners also cite NPS's conclusion in its NEPA analysis that it did not "anticipate any impacts to public health or safety *within the Park*" in

---

[11] The advisory group "provide[s] continuing advice and counsel with respect to commercial air tour operations over and near national parks." 49 U.S.C. § 40128 note.

an erroneous attempt to argue that FAA's safety analysis for the airspace *above the Park* was inadequate. Opening Br. 24-25 (emphasis added) (quoting 1-ER-25). These stray references to NEPA do not constitute NEPA claims. *See Alonso*, 48 F.3d at 1544 (an issue given only "perfunctory treatment" in an appellant brief need not be considered); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Petitioners have accordingly forfeited a NEPA claim.

Petitioners also lack a right of action to bring a NEPA claim because their asserted injury falls outside NEPA's zone of interests. A plaintiff challenging agency action under NEPA must bring its claims under the APA, which provides a private right of action for a person "adversely affected or aggrieved by agency action within the meaning of the relevant statute." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) (citing 5 U.S.C. § 702). The interests the complainant seeks to protect must accordingly be "within the zone of interests to be protected or regulated by the statute in question," *id.* at 939-40 (cleaned up), and this Court has "long described the zone of interests that NEPA protects as being environmental," *id.* at 940. Because Petitioners do not claim to protect any interest even "remotely intertwined with the environment," but rather assert "purely economic interests" as commercial air tour operators, Petitioners lack a

right of action to bring a NEPA claim. *Id.*; *see* Opening Br. 14-15 (asserting injury based on alleged "adverse consequences" of ATMP on commercial air tour businesses).

Nevertheless, if this Court evaluates whether FAA's safety analysis complies with NEPA, the record shows that FAA—exercising its expertise in aviation safety—reasonably determined that the ATMP was safe, and NPS reasonably relied on FAA's determination. *See* 1-ER-11, 13, 43-46, 48-50, 54, 57, 67-69, 72; SER-31-32.

*       *       *

In sum, the Agencies reasonably responded to significant comments about safety and analyzed all relevant safety issues when they adopted the ATMP.

### B. The Agencies reasonably considered concerns about the ATMP's potential impacts to elderly, disabled and mobility-impaired persons.

Petitioners argue that the Agencies "failed to address" public comments about the ATMP's purported impacts on elderly, disabled, and mobility-impaired persons. *See* Opening Br. 30. But Petitioners again fail to grapple with the record. The record shows that the Agencies reasonably complied with the APA's procedural requirements by responding to these comments and explaining how NPS ensures access to the Park for these persons. Nor were the Agencies required

to make any substantive changes to the ATMP to account for the concerns that
Petitioners raise.

### 1. The Agencies sufficiently considered and responded to public comments about accessibility.

Contrary to Petitioners' argument, Opening Br. 30, the Agencies reasonably responded to public comments about the ATMP's purported impacts on elderly, disabled, and mobility-impaired persons who may choose to pay to view the Park by air. SER-16-17. Far from ignoring the issue, the Agencies met the APA's procedural requirements by explaining how these persons may continue to access the Park, and also by explaining how NPS devotes substantial resources and expertise to ensuring Park access for these persons.[12]

In the Comment Summary Report, the Agencies acknowledged commenters who noted that air tours "offer opportunities for the elderly and disabled people to see [Park] landmarks," and that "denying helicopter access create[s] an unfair disparity of those already facing physical limitations." SER-16. In response, the Agencies explained that air tours "are only one of many ways for a person with disabilities to experience a national park," and that if an ATMP "reduces or

---

[12] The Agencies do not concede that the comments highlighted by Petitioners were "significant" and required a response, as Petitioners argue, *see* Opening Br. 34, but it is unnecessary to reach that issue because the Agencies responded to these comments, SER-16-17.

eliminates air tours, a person with disabilities would still be able to experience a national park." *Id.*

The Agencies also detailed NPS's extensive policies and programs designed to "ensure that people with disabilities can participate in the same programs, activities, and employment opportunities available to those without disabilities" in the Park by providing "[a]lternative means of accessing facilities, programs and services" when "an accessible direct experience cannot be provided." *Id.* NPS develops accessibility solutions "in consultation with the disability community" and partners such as "NPS concessioners and commercial service operators," and has a team dedicated to making parks "more inclusive for people with sensory, physical, and cognitive disabilities." SER-16-17. NPS's "regional accessibility coordinators" ensure that "NPS staff have the tools and training necessary to provide accessible and inclusive outdoor recreation and interpretation opportunities." SER-17. This explanation met the procedural obligation to "provide[] a reasoned response" to comments about impacts to elderly, disabled, and mobility-impaired persons. *Safari Aviation*, 300 F.3d at 1151.

The Court should reject Petitioners' arguments that the Agencies "ignored" and "did not consider" the ATMP's purported impacts on elderly, disabled, and mobility-impaired persons because Petitioners once again breeze by the record before the Court. Opening Br. 35-36. Petitioners cite one portion of NPS's finding

of no significant impact, which explains that some air tour patrons "may not be able to take an air tour over the Park because of the [ATMP's] reduced number of air tours," 1-ER-23, and fault that analysis for not discussing impacts to elderly, disabled, and mobility-impaired persons, *see* Opening Br. 35-36. But Petitioners nowhere cite or even acknowledge that NPS specifically responded to comments about impacts to elderly, disabled, and mobility-impaired persons in the Comment Summary Report, which the Record of Decision expressly incorporates by reference. 1-ER-46; SER-16-17. Just as with Petitioners' safety arguments, the Court may reject this argument simply because Petitioners have failed to grapple with this key portion of the record. *See Bldg. Indus. Ass'n*, 792 F.3d at 1034; *Chapman*, 146 F.3d at 1172. Nor should the Court accept any new legal arguments about the Comment Summary Report if raised in Petitioners' reply brief because those arguments have been forfeited. *See Eberle*, 901 F.2d at 818.[13]

Petitioners' reliance on cases in which agencies failed to address significant comments is inapt. *See* Opening Br. 30, 36-37 (citing *Mexican Gulf Fishing Co.*, 60 F.4th at 972–73 (holding that government "did not address" the "significant issue" of privacy concerns); *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 173 (D.D.C. 2021) (holding that agency

---

[13] Any argument that the Comment Summary Report has not been incorporated into the Record of Decision is also incorrect, and in any event forfeited. 1-ER-46.

"largely disregarded" comments raising a significant issue); *D.C. v. United States Dep't of Agric.*, 496 F. Supp. 3d 213 (D.D.C. 2020) (noting lack of "any meaningful discussion of the issue")). Unlike in those cases, here NPS meaningfully responded to comments about impacts to elderly, disabled, and mobility-impaired persons and provided a reasonable explanation of how the agency ensures access to the Park for all. *See* SER-16-17.

Nor can Petitioners characterize NPS's response to comments as a perfunctory or inadequate explanation that "air tour patrons may also visit [the] Park by ground." Opening Br. 36. NPS detailed how it has developed extensive accessible Park facilities on the ground, as well as elaborate programs to make the Park accessible. *See* SER-16-17. Petitioners' assumption that elderly, disabled, and mobility-impaired persons "lack the physical ability to visit [the] Park by ground," Opening Br. 36, is simply not true given these comprehensive efforts, *see* SER-16-17. And the Agencies explained that even when an ATMP "*reduces*" air tours, disabled persons "would still be able to experience a national park." SER-16 (emphasis added). For example, such persons may still participate in the Park's 1,548 authorized air tours per year. 1-ER-64.

Finally, while Petitioners might argue that the Agencies should have further responded to the comments contained in the bullet-list in the Opening Brief, *see* Opening Br. 30-32, an agency need only respond to "relevant" and "significant"

comments, *Altera Corp.*, 926 F.3d at 1080, and is under "no obligation" to respond to all "specific issues raised in comments," *Alvorada Community*, 155 F.3d at 1122. Petitioners have not developed any other argument showing that NPS was required to respond to comments about purported impacts to elderly, disabled, and mobility-impaired persons beyond those addressed in the Comment Summary Report. *See* SER-16-17. Because the Agencies complied with their procedural obligation to respond to accessibility concerns, Petitioners' arguments fail.

> **2. Petitioners' substantive arguments about accessibility lack support under the Management Act and have otherwise been forfeited.**

To the extent that Petitioners make substantive arguments that the Agencies were required to prevent the ATMP's purported "significant impacts" on elderly, disabled, or mobility-impaired persons, *see* Opening Br. 35-36, there is no basis for that argument. First, the Management Act does not require the Agencies to increase an ATMP's authorized flights—and those flights' impacts on park resources and visitor experience—to lessen possible impacts on air tour patrons. Second, Petitioners have forfeited making these arguments under other laws. Third, Petitioners' assumption that the ATMP imposes "significant impacts" is incorrect given that the Park is accessible.

If Petitioners' argument is that paying customers of commercial air tours are visitors to the Park, and that the Agencies have a substantive requirement to prevent "significant impacts" to those persons, *see* Opening Br. 35-36, that argument is not adequately preserved. *See Alonso*, 48 F.3d at 1544 (an issue given only "perfunctory treatment" in an appellant brief need not be considered). That argument is also incorrect. The Management Act draws a sharp distinction between persons who choose to view a park by paying for a commercial air tour *over* a park, and persons who visit the park on the ground. *Compare* 49 U.S.C. § 40128(a)(1) (prohibiting commercial air tours "over a national park or tribal lands" except as allowed under the Management Act), *with id*. § 40128(b)(1)(B) (identifying the objective of an ATMP to be to "prevent the significant adverse impacts, if any, of commercial air tour operations upon the . . . visitor experiences"). Congress directed the Agencies to "mitigate or prevent the significant adverse impacts" of commercial air tours on park visitors, who are persons who visit parks on the ground. *Id*. § 40128(b)(1)(B). Congress did not— as Petitioners imply, if not expressly argue—direct the Agencies to consider "adverse impacts" on paying customers of those same commercial air tours. *Id*.[14]

---

[14] This distinction tracks NPS Management Policies and the Park's planning documents, which use the term "visitor experience" to refer to the experience of persons visiting the park on the ground. *See* SER-113-19 (using the terms "visitor experience," "visitor use," and "visitor services"); SER-91-92 (explaining that an ATMP would prevent any significant impacts caused by commercial air tours on

Indeed, the Management Act permits the Agencies to ban all air tours over parks, 49 U.S.C. § 40128(b)(3)(A), confirming that Congress did not intend to require the Agencies to sacrifice park resources and the Park's visitor experience to mitigate purported impacts on air tour patrons.

Petitioners make some references to NPS's NEPA analysis, but never allege that the Agencies violated NEPA. *See* Opening Br. 36. Specifically, Petitioners cite to NPS's NEPA finding that adopting the ATMP would have no "significant impacts" on air tour patrons, 1-ER-17, 22, to argue that the Agencies failed to address allegedly "significant impacts" to elderly, disabled, and mobility-impaired persons, Opening Br. 36. But as explained, Petitioners' stray references to NPS's NEPA analysis do not appropriately allege a NEPA claim, and Petitioners lack a cause of action to bring a NEPA claim because they do not allege an environmental injury within NEPA's zone of interests. *See supra*, pp. 36-38.

Petitioners also briefly cite the Americans with Disabilities Act and cases applying that statute. *See* Opening Br. 34-35 (citing 42 U.S.C. § 12101; *Galusha v. New York State Dept. of Envtl. Conservation*, 27 F. Supp. 2d 117 (N.D.N.Y. 1998)). But no commenter expressly raised the Disabilities Act, so the Agencies were not obligated to address that issue in their decision. *See* 49 U.S.C. § 46110(d)

---

"visitor experiences at the park"). NPS Management Policies define a "visitor" as a person who "physically visits a park" or uses NPS's interpretive or educational services. SER-121.

(statutory exhaustion requirement for FAA orders). And Petitioners have forfeited any argument under the Disabilities Act by failing to articulate how that law's substantive requirements applied to the ATMP process. *See Alonso*, 48 F.3d at 1544.

Even if Petitioners' substantive argument had any basis in law and was not otherwise waived or forfeited, it is not supported by the record. Petitioners' argument is based on the incorrect assumption that the ATMP's reduction in flights would prevent elderly, disabled, or mobility-impaired persons from experiencing the Park. *See* Opening Br. 36 (arguing that a reduction in air tours impacts those who cannot "visit [the] Park by ground"). But Petitioners point to no evidence in the record that such persons have been or will be precluded from visiting the Park by ground due to age or disability. The Park has ample ground facilities that allow all persons, including elderly, disabled, and mobility-impaired persons, to experience the Park. Such facilities include 65 miles of scenic roadway with interpretive media, wayside exhibits, and "outstanding views and opportunities to explore active volcanic landscapes." SER-98; *see also* SER-88 (providing map of scenic road circling Kīlauea Caldera); SER-89-90 (providing examples of accessible overlooks). Additionally, the ATMP authorizes 1,548 air tours per year—an average of almost 30 flights per week—which provides reasonable opportunities for persons who can afford the cost of air tours, including elderly,

disabled, and mobility-impaired persons, to view the Park from the air.  1-ER-64.[15]

In short, NPS continues to provide access to the Park and experiences associated

with the Park for all persons, including disabled, elderly, and mobility-impaired

persons.

*      *      *

The Agencies reasonably responded to comments raising concerns about

impacts to elderly, disabled, and mobility-impaired persons, and explained how

NPS ensures access to the Park for such persons.  Nor were the Agencies required

to make any substantive changes to the ATMP in response to these comments.

Any contrary argument by Petitioners lacks legal support or is waived or forfeited.

## II.    The appropriate remedy, if any, is remand without vacatur.

Contrary to Petitioners' arguments, *see* Opening Br. 37-38, it is "well-

established" that vacatur of agency action is not always required, *United States v.*

*Afshari*, 426 F.3d 1150, 1156 (9th Cir. 2005); *see Sugar Cane Growers Coop. v.*

*Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (holding that it "is simply not the law"

that a court must vacate an agency action).  That rule applies equally in cases

reviewed under 49 U.S.C. § 46110(c)'s authorization to "affirm, amend, modify, or

set aside any part of the order."  *See City of Los Angeles v. Dickson*, 2021 WL

---

[15] But for those who cannot afford commercial air tours, a Park visitor may drive a car to an overlook to view the Park's volcanoes for a modest entrance fee. SER-87.

2850586, at *3 (9th Cir. July 8, 2021) (remanding without vacatur in case brought under 49 U.S.C. § 46110(c)).

This Court looks to the two factors described in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), to make an equitable determination about whether vacatur is appropriate. *See Cal. Cmties. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). A court must first consider "how serious the agency's errors are" and, second, the "disruptive consequences" that would result from vacatur. *Id.* Even if Petitioners prevail on their claims, which they should not, vacatur is not warranted under these factors.

First, any purported errors in the Agencies' decision are not sufficiently serious to require vacating the ATMP because the Agencies could cure them on remand with further explanation. Fundamentally, Petitioners argue that the Agencies did not appropriately "evaluate and assess" commenters' concerns about safety and purported impacts to elderly, disabled, and mobility-impaired persons. Opening Br. 18, 19. But even if the Court finds that the Agencies could have better explained their consideration of and responses to these comments, these comments do not show that the Agencies would be unable to justify their original decision. Importantly, FAA concluded that the ATMP is safe and the Court owes that expert technical judgment deference. *See supra*, pp. 30-31. Because any purported errors could be remedied with additional explanation on remand, vacatur

is inappropriate. *See Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("When an agency may be able readily to cure a defect in its explanation of a decision, the first factor in *Allied–Signal* counsels remand without vacatur."); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010) ("[W]e remand but do not vacate the Final Rule for [the agency] to provide an explanation of the training provision.").

Second, the Court should not vacate the ATMP because the disruptive environmental consequences of vacatur would outweigh the seriousness of any possible agency errors. Petitioners argue that vacating the ATMP and returning to the "status quo ante" would restore interim operating authority, which does not provide any designated routes, minimum altitudes, or scheduling parameters for air tours. *See* Opening Br. 38. But NPS determined that operators flying under interim operating authority resulted in "unacceptable impacts to Park resources and values," 1-ER-17, which includes significant impacts to, among other things, critically endangered birds and the fragile Hawaiian ecosystems, Native Hawaiian cultural resources, designated Wilderness, and the Park's visitor experience. 1-ER-46. The magnitude of this environmental harm, which outweighs any possible agency errors, makes vacatur inappropriate. *See, e.g., Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995) (declining to vacate where

vacatur of listing decision would risk extinction of snail species); *Cal. Cmties.*, 688 F.3d at 994 (declining to vacate where vacatur would lead to further air pollution).

*    *    *

If the Court rules against the Agencies on the merits, it should exercise its discretion to remand without vacatur. The Agencies have made at most minor procedural errors that can be cured on remand and vacatur would create disruptive environmental consequences.

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

Of Counsel:

PATRICIA DEEM
*Senior Attorney*
Office of the Chief Counsel
Federal Aviation Administration

SARA PORSIA
*Attorney*
Office of the Solicitor
U.S. Department of the Interior

August 21, 2024
90-13-1-17579

 s/ Benjamin W. Richmond
TODD KIM
*Assistant Attorney General*

JUSTIN D. HEMINGER
BENJAMIN W. RICHMOND
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3977
benjamin.richmond@usdoj.gov

### Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**          24-1008

I am the attorney or self-represented party.

**This brief contains 11,277 words,** including 156 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f).

The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs; or
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**   s/ Benjamin W. Richmond

**Date**        August 21, 2024

# ADDENDUM

## Statutes

49 U.S.C. § 40128.................................................................2a

49 U.S.C. § 40128 note.......................................................11a

## Regulations

14 C.F.R. § 91.3................................................................13a

14 C.F.R. § 136.33............................................................14a

## 49 U.S.C. § 40128 – Overflights of national parks

(a) In general.--

(1) General requirements.--A commercial air tour operator may not conduct commercial air tour operations over a national park or tribal lands, as defined by this section, except--

(A) in accordance with this section;

(B) in accordance with conditions and limitations prescribed for that operator by the Administrator; and

(C) in accordance with any applicable air tour management plan or voluntary agreement under subsection (b)(7) for the park or tribal lands.

(2) Application for operating authority.--

(A) Application required.--Before commencing commercial air tour operations over a national park or tribal lands, a commercial air tour operator shall apply to the Administrator for authority to conduct the operations over the park or tribal lands.

(B) Competitive bidding for limited capacity parks.--Whenever an air tour management plan limits the number of commercial air tour operations over a national park during a specified time frame, the Administrator, in cooperation with the Director, shall issue operation specifications to commercial air tour operators that conduct such operations. The operation specifications shall include such terms and conditions as the Administrator and the Director find necessary for management of commercial air tour operations over the park. The Administrator, in cooperation with the Director, shall develop an open competitive process for evaluating proposals from persons interested in providing commercial air tour operations over the park. In making a selection from among various proposals submitted, the Administrator, in cooperation with the Director, shall consider relevant factors, including—

2a

(i) the safety record of the person submitting the proposal or pilots employed by the person;

(ii) any quiet aircraft technology proposed to be used by the person submitting the proposal;

(iii) the experience of the person submitting the proposal with commercial air tour operations over other national parks or scenic areas;

(iv) the financial capability of the person submitting the proposal;

(v) any training programs for pilots provided by the person submitting the proposal; and

(vi) responsiveness of the person submitting the proposal to any relevant criteria developed by the National Park Service for the affected park.

(C) Number of operations authorized.--In determining the number of authorizations to issue to provide commercial air tour operations over a national park, the Administrator, in cooperation with the Director, shall take into consideration the provisions of the air tour management plan, the number of existing commercial air tour operators and current level of service and equipment provided by any such operators, and the financial viability of each commercial air tour operation.

(D) Cooperation with NPS.--Before granting an application under this paragraph, the Administrator, in cooperation with the Director, shall develop an air tour management plan in accordance with subsection (b) and implement such plan.

(E) Time limit on response to ATMP applications.--The Administrator shall make every effort to act on any application under this paragraph and issue a decision on the application not later than 24 months after it is received or amended.

(F) Priority.--In acting on applications under this paragraph to provide commercial air tour operations over a national park, the Administrator

shall give priority to an application under this paragraph in any case in which a new entrant commercial air tour operator is seeking operating authority with respect to that national park.

. . .

(5) Exemption for national parks with 50 or fewer flights each year.—

(A) In general.--Notwithstanding paragraph (1), a national park that has 50 or fewer commercial air tour operations over the park each year shall be exempt from the requirements of this section, except as provided in subparagraph (B).

(B) Withdrawal of exemption.--If the Director determines that an air tour management plan or voluntary agreement is necessary to protect park resources and values or park visitor use and enjoyment, the Director shall withdraw the exemption of a park under subparagraph (A).

. . .

(b) Air tour management plans.--

(1) Establishment.--

(A) In general.--The Administrator, in cooperation with the Director, shall establish an air tour management plan for any national park or tribal land for which such a plan is not in effect whenever a person applies for authority to conduct a commercial air tour operation over the park. The air tour management plan shall be developed by means of a public process in accordance with paragraph (4).

(B) Objective.--The objective of any air tour management plan shall be to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands.

. . .

(2) Environmental determination.--In establishing an air tour management plan under this subsection, the Administrator and the Director shall each sign the environmental decision document required by section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. § 4332) which may include a finding of no significant impact, an environmental assessment, or an environmental impact statement and the record of decision for the air tour management plan.

(3) Contents.--An air tour management plan for a national park—

(A) may prohibit commercial air tour operations over a national park in whole or in part;

(B) may establish conditions for the conduct of commercial air tour operations over a national park, including commercial air tour routes, maximum or minimum altitudes, time-of-day restrictions, restrictions for particular events, maximum number of flights per unit of time, intrusions on privacy on tribal lands, and mitigation of noise, visual, or other impacts;

(C) shall apply to all commercial air tour operations over a national park that are also within ½ mile outside the boundary of a national park;

(D) shall include incentives (such as preferred commercial air tour routes and altitudes, relief from caps and curfews) for the adoption of quiet aircraft technology by commercial air tour operators conducting commercial air tour operations over a national park;

(E) shall provide for the initial allocation of opportunities to conduct commercial air tour operations over a national park if the plan includes a limitation on the number of commercial air tour operations for any time period; and

(F) shall justify and document the need for measures taken pursuant to subparagraphs (A) through (E) and include such justifications in the record of decision.

(4) Procedure.--In establishing an air tour management plan for a national park or tribal lands, the Administrator and the Director shall--

(A) hold at least one public meeting with interested parties to develop the air tour management plan;

(B) publish the proposed plan in the Federal Register for notice and comment and make copies of the proposed plan available to the public;

(C) comply with the regulations set forth in sections 1501.3 and 1501.5 through 1501.8 of title 40, Code of Federal Regulations (for purposes of complying with the regulations, the Federal Aviation Administration shall be the lead agency and the National Park Service is a cooperating agency);

(D) solicit the participation of any Indian tribe whose tribal lands are, or may be, overflown by aircraft involved in a commercial air tour operation over the park or tribal lands to which the plan applies, as a cooperating agency under the regulations referred to in subparagraph (C); and

(E) consult with the advisory group established under section 805 of the National Parks Air Tour Management Act of 2000 (49 U.S.C. 40128 note) and consider all advice, information, and recommendations provided by the advisory group to the Administrator and the Director.

(5) Judicial review.--An air tour management plan developed under this subsection shall be subject to judicial review.

(6) Amendments.--The Administrator, in cooperation with the Director, may make amendments to an air tour management plan. Any such amendments shall be published in the Federal Register for notice and comment. A request for amendment of an air tour management plan shall be made in such form and manner as the Administrator may prescribe.

(7) Voluntary agreements.—

(A) In general.--As an alternative to an air tour management plan, the Director and the Administrator may enter into a voluntary agreement with a commercial air tour operator (including a new entrant

commercial air tour operator and an operator that has interim operating authority) that has applied to conduct commercial air tour operations over a national park to manage commercial air tour operations over such national park.

. . .

(c) Interim operating authority.--

    (1) In general.--Upon application for operating authority, the Administrator shall grant interim operating authority under this subsection to a commercial air tour operator for commercial air tour operations over a national park or tribal lands for which the operator is an existing commercial air tour operator.

    (2) Requirements and limitations.--Interim operating authority granted under this subsection--

        (A) shall provide annual authorization only for the greater of--

            (i) the number of flights used by the operator to provide the commercial air tour operations over a national park within the 12-month period prior to the date of the enactment of this section; or

            (ii) the average number of flights per 12-month period used by the operator to provide such operations within the 36-month period prior to such date of enactment, and, for seasonal operations, the number of flights so used during the season or seasons covered by that 12-month period;

        (B) may not provide for an increase in the number of commercial air tour operations over a national park conducted during any time period by the commercial air tour operator above the number that the air tour operator was originally granted unless such an increase is agreed to by the Administrator and the Director;

        (C) shall be published in the Federal Register to provide notice and opportunity for comment;

(D) may be revoked by the Administrator for cause;

(E) shall terminate 180 days after the date on which an air tour management plan is established for the park or tribal lands;

(F) shall promote protection of national park resources, visitor experiences, and tribal lands;

. . .

(d) Commercial air tour operator reports.—

(1) Report.--Each commercial air tour operator conducting a commercial air tour operation over a national park under interim operating authority granted under subsection (c) or in accordance with an air tour management plan or voluntary agreement under subsection (b) shall submit to the Administrator and the Director a report regarding the number of commercial air tour operations over each national park that are conducted by the operator and such other information as the Administrator and Director may request in order to facilitate administering the provisions of this section.

(2) Report submission.--Not later than 90 days after the date of enactment of the FAA Modernization and Reform Act of 2012, the Administrator and the Director shall jointly issue an initial request for reports under this subsection. The reports shall be submitted to the Administrator and the Director with a frequency and in a format prescribed by the Administrator and the Director.

. . .

(g) Definitions.--In this section, the following definitions apply:

(1) Commercial air tour operator.--The term "commercial air tour operator" means any person who conducts a commercial air tour operation over a national park.

. . .

(4) Commercial air tour operation over a national park.--

(A) In general.--The term "commercial air tour operation over a national park" means any flight, conducted for compensation or hire in a powered aircraft where a purpose of the flight is sightseeing over a national park, within ½ mile outside the boundary of any national park (except the Grand Canyon National Park), or over tribal lands (except those within or abutting the Grand Canyon National Park), during which the aircraft flies—

(i) below a minimum altitude, determined by the Administrator in cooperation with the Director, above ground level (except solely for purposes of takeoff or landing, or necessary for safe operation of an aircraft as determined under the rules and regulations of the Federal Aviation Administration requiring the pilot-in-command to take action to ensure the safe operation of the aircraft); or

(ii) less than 1 mile laterally from any geographic feature within the park (unless more than ½ mile outside the boundary).

(B) Factors to consider.--In making a determination of whether a flight is a commercial air tour operation over a national park for purposes of this section, the Administrator may consider--

(i) whether there was a holding out to the public of willingness to conduct a sightseeing flight for compensation or hire;

(ii) whether a narrative that referred to areas or points of interest on the surface below the route of the flight was provided by the person offering the flight;

(iii) the area of operation;

(iv) the frequency of flights conducted by the person offering the flight;

(v) the route of flight;

(vi) the inclusion of sightseeing flights as part of any travel arrangement package offered by the person offering the flight;

(vii) whether the flight would have been canceled based on poor visibility of the surface below the route of the flight; and

(viii) any other factors that the Administrator and the Director consider appropriate.

**49 U.S.C. § 40128 note – Sec. 805. Advisory Group.**

(a) Establishment.--Not later than 1 year after the date of the enactment of this Act [Apr. 5, 2000], the Administrator [of the Federal Aviation Administration] and the Director of the National Park Service shall jointly establish an advisory group to provide continuing advice and counsel with respect to commercial air tour operations over and near national parks.

(b) Membership.--

    (1) In general.--The advisory group shall be composed of--

        (A) a balanced group of--

            (i) representatives of general aviation;

            (ii) representatives of commercial air tour operators;

            (iii) representatives of environmental concerns; and

            (iv) representatives of Indian tribes;

        (B) a representative of the Federal Aviation Administration; and

        (C) a representative of the National Park Service.

    (2) Ex officio members.--The Administrator (or the designee of the Administrator) and the Director (or the designee of the Director) shall serve as ex officio members.

    (3) Chairperson.--The representative of the Federal Aviation Administration and the representative of the National Park Service shall serve alternating 1-year terms as chairman of the advisory group, with the representative of the Federal Aviation Administration serving initially until the end of the calendar year following the year in which the advisory group is first appointed.

(c) Duties.--The advisory group shall provide advice, information, and recommendations to the Administrator and the Director--

(1) on the implementation of this title and the amendments made by this title;

(2) on commonly accepted quiet aircraft technology for use in commercial air tour operations over a national park or tribal lands, which will receive preferential treatment in a given air tour management plan;

(3) on other measures that might be taken to accommodate the interests of visitors to national parks; and

(4) at the request of the Administrator and the Director, safety, environmental, and other issues related to commercial air tour operations over a national park or tribal lands.

. . .

**14 C.F.R. § 91.3 – Responsibility and authority of the pilot in command.**

(a) The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.

(b) In an in-flight emergency requiring immediate action, the pilot in command may deviate from any rule of this part to the extent required to meet that emergency.

. . .

**14 C.F.R. § 136.33 – Definitions.**

. . .

(d) Commercial air tour operation--

(1) Means any flight, conducted for compensation or hire in a powered aircraft where a purpose of the flight is sightseeing over a national park, within 1/2 mile outside the boundary of any national park, or over tribal lands, during which the aircraft flies--

(i) Below 5,000 feet above ground level (except for the purpose of takeoff or landing, or as necessary for the safe operation of an aircraft as determined under the rules and regulations of the Federal Aviation Administration requiring the pilot-in-command to take action to ensure the safe operation of the aircraft);

(ii) Less than 1 mile laterally from any geographic feature within the park (unless more than 1/2 mile outside the boundary); or

(iii) Except as provided in § 136.35.

(2) The Administrator may consider the following factors in determining whether a flight is a commercial air tour operation for purposes of this subpart--

(i) Whether there was a holding out to the public of willingness to conduct a sightseeing flight for compensation or hire;

(ii) Whether a narrative that referred to areas or points of interest on the surface below the route of the flight was provided by the person offering the flight;

(iii) The area of operation;

(iv) The frequency of flights conducted by the person offering the flight;

(v) The route of flight;

14a

(vi) The inclusion of sightseeing flights as part of any travel arrangement package offered by the person offering the flight;

(vii) Whether the flight would have been canceled based on poor visibility of the surface below the route of the flight; and

(viii) Any other factors that the Administrator and Director consider appropriate.

. . .